UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-81280-CIV-MARRA

FLORIDA IMMIGRANT COALITION; EL SOL,
JUPITER'S NEIGHBORHOOD CENTER; AND
CORN MAYA, INC.,

Plaintiffs,

vs.

MARCOTULIO MENDEZ,

Plaintiff-Petitioner,

vs.

PALM BEACH COUNTY SHERIFF RIC
L. BRADSHAW,

Defendant.
_____/

**OPINION AND ORDER**

This cause is before the Court upon Defendant Ric L. Bradshaw's Motion for Summary

Judgment (DE 53); Defendant's Motion in Limine and/or Motion to Strike Plaintiffs' Declaration

Exhibits (DE 86) and Plaintiffs' Motion to Supplement its Opposition to Defendant's Motion for

Summary Judgment (DE 87).  The Court has carefully considered the motions and is otherwise

fully advised in the premises.

I.  Background

The facts, as culled from affidavits, exhibits, depositions, answers, answers to

interrogatories and reasonably inferred therefrom in the light most favorable for the plaintiffs, for

the purpose of this motion, are as follows:

Title 8, § 287.7 of the Code of Federal Regulations sets forth obligations for the Palm

Beach County Sheriff's Office ("Sheriff's Office") by the Department of Homeland Security

when immigration authorities place detainers on inmates:

> (a) Detainers in general. Detainers are issued pursuant to sections 236 and 287 of the Act and this chapter 1. Any authorized immigration officer may at any time issue a Form I-247, Immigration Detainer-Notice of Action, to any other Federal, State, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible.

> (d) Temporary detention at Department request. Upon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department.

Title 8, § 236.6 of the Code of Federal Regulations sets forth obligations for the Sheriff

while detaining persons on behalf of

Immigration and Custom Enforcement ("ICE"):

> No person, including any state or local government entity or any privately operated detention facility, that houses, maintains, provides services to, or otherwise holds any detainee on behalf of the Service (whether by contract or otherwise), and no other person who by virtue of any official or contractual relationship with such person obtains information relating to any detainee, shall disclose or otherwise permit to be made public the name of, or other information relating to, such detainee. Such information shall be under the control of the Service and shall be subject to public disclosure only pursuant to the provisions of applicable federal laws, regulations and executive orders. Insofar as any documents or other records contain such information, such documents shall not be public records. This section applies to all persons and information identified or described in it, regardless of when such persons obtained such information, and applies to all requests for public disclosure of such information, including requests that are the subject of proceedings pending as of April 17, 2002.

On June 4, 2008, the Fourth District Court of Appeal of Florida issued <u>Ricketts v. Palm</u>

2

Beach County Sheriff, 985 So. 2d 591 (Fla. Dist. Ct. App. 2008) which articulated the Palm

Beach County Sheriff's Office specific procedure in place at that time in processing detainees

with an I-247 detainer.  Ricketts explained that procedure as follows:

> When subjects arrive at the jail, federal agents from ICE place in the jail record a form I-247, which is considered a detainer. This document requires the recipient to detain an alien for forty-eight hours after the alien ceases to be in custody on state charges. If a form I-203 is filed, and the alien has been released from state custody, the alien continues to be held and is considered to be in federal custody pending deportation proceedings. At that time, the alien remains in jail as a federal detainee until ICE takes custody of the alien from the sheriff. The jail receives monetary consideration pursuant to a contract with the federal government for holding federal prisoners, which consideration begins to run after the detainee is booked pursuant to the form I-203.

Id. at 592.

Captain Robert Manley, as the supervisor of intake and release at Palm Beach County's

main detention center, is the person at the Sheriff's Office with the most knowledge about

releasing inmates from jail and the interplay between I-247, I-203 and ICE holds and bonds.

(Manley Dep. at 206, attached to DE 54-5; Manley Aff. ¶ 1, 12, attached to DE 54-4.)   At all

material times, he has been available to answer questions that citizens, lawyers or other interested

persons may have regarding the status of detainees and to explain the nature of holds that have

been placed on such detainees by other jurisdictions. (Manley Aff. ¶ 4.)  Captain Manley testified

that every foreign born detainee at the jail has an immigration check run on them, which is

known as an "IAQ" or "Immigration Alien Query." (Manley Dep. at 209.)  If there is no response

to the query from the federal immigration system, the detainee would not be held.  If there is a

response, the Sheriff's Office will receive an I-247.  (Manley Dep. at 209-10.)  If ICE indicates

an interest in a detainee, it has 48 hours to assume custody of that detainee after local charges are

completed.  ICE holds can be removed by ICE by either teletype, facsimile or in person. (Manley

Aff. ¶ 7; Manley Dep. at 137-38.)

According to Captain Manley's affidavit, prior to May 2009, the Sheriff's Office had a contract with the United States Marshall and the federal government to hold and house detainees who had ICE holds placed on them.  That contract expired, and effective May 12, 2009, the main detention center, which is part of the Palm Beach County jail system, no longer housed ICE detainees who also did not have state criminal charges pending. (Manley Aff. ¶ 7.)

According to Captain Manley, if a detainee has an ICE hold against them, a bond can be posted and the bond will be registered. (Manley Dep. at 47-48.)  The person posting the bond would be advised that, if there is an ICE hold, the detainee would not be released. (Manley Dep. at 48.)  If the ICE hold was removed, and there are no other charges or other holds, they would be released. (Manley Dep. at 84-85.)  Captain Manley has written emails in response to questions by jail staff about how immigration inquires are handled.  For example, on July 31, 2007, he wrote an email about how the staff was instructed to advise federal authorities when a detainee is ready for release, and that they have two hours to determine if a hold should be placed on a particular detainee. (Manley Aff. ¶ 10; July 2007 email, Ex. A attached to Manley Aff.)  In a June 2008 email, Captain Manley reminded staff that subjects should not be held for more than two hours while waiting for the determination about federal holds and that the Sheriff's Office does not refuse any bonds because of holds. (Manley Aff. ¶ 11; June 2008 email, Ex. B, attached to Manley Aff.)  Captain Manley has no personal knowledge of a jail staff member specifically refusing to accept any cash bond, but in order to "protect those posting the bonds," he has made sure that there are "advisements that detainees may not be released upon the posting of cash bonds, primarily because of the variables and intricacies involved with federal ICE holds."

(Manley Aff. ¶ 11.)  Captain Manley's affidavit states that the jail has a proper computer system to ensure accurate inmate management. (Manely Aff. ¶ 14.)

Deputy Isaias Flores was trained for at least one month pertaining to "releases" and three days in the area of bonds. (Flores Dep. at 13, attached to DE 54-6.)  If an individual came to post bond for an inmate that has an ICE hold, that individual was told he or she "could post bond but [ ] the individual has a federal hold." He would not say anything about when that individual may be able to be  released. (Flores Dep. at 21.)  An individual does not need to be a citizen to post bond for an inmate. (Flores Dep. at 29-30.)  Deputy Flores never contacted ICE to report possible immigration violations of detainees, nor had he notified ICE to place detainers on such individuals. (Flores Dep. at 32.)  Captain Manley states that although the federal ICE hold lasts only 48 hours, they do not inform people posting bond of this fact. (Manley Dep. at 49.)   Deputy Gerald Mitchell testified that if an individual has an ICE hold against him and a family member is trying to post bond, he would allow them to post the bond but he would also advise the family member that the detainee would not be released due to the ICE hold. (Mitchell Dep. at 16, 21, 30, 40 attached to 70-1; Manley Dep. at 129, 133, 139.)   Deputy Mitchell does not know if the ICE hold goes away after a certain time period. (Mitchell Dep. at 18, 52.)  Deputy Sheriff Gwen Morales testified that if someone has an immigration hold, she would tell the person trying to post a bond that there is "a hold for immigration, so there is no bond at this time." (Morales Dep. at 25.)  If there is a hold, they cannot be released "until either ICE or the Feds or county comes to pick them up." (Morales Dep. at 44.)  Captain Manley does advise people that they could lose the bond money. (Manley Dep. at 166-69.)  Captain Manley testified that there is no difference between posting a bond for persons with or without ICE detainers, except that they would be

advised of ICE holds. (Manley Dep. at 129-30.)

According to Captain Manley, the Sheriff's Office has not refused to accept bonds. Instead, detainees subject to ICE holds have chosen not to post the bonds. (Manley Dep. at 132.) Captain Manley stated that it is not a violation of the Sheriff's Office policy to advise persons posting bonds that the detainee has a federal hold. (Manley Dep. at 133-34.)  In addition, it would be accurate to state that there is no bond at this time or there is no bond to post if the detainee has entered into the 48 hour time hold period. (Manley Dep. at 136.)

Mr. Mendez testified that he elected to pay a bond and that he signed the papers but he was not able to post the bond. (Mendez Dep. at 73.)  Mr. Mendez, who entered the jail on May 19, 2009, was held in jail for over five months. (Mendez Dep. at 53, attached to DE 70-1; Compl. ¶ 3.) Captain Manley states that there was no unreasonable delay in processing Mr. Mendez's status at the jail and he was not aware of any staff member who refused to accept any bond pertaining to Mr. Mendez. (Manley Aff. ¶ 15.)  If a person had trouble posting bond, there was a deputy sheriff sergeant on duty to field questions and Captain Manley could be contacted as well. (Manley Dep. at 150-51.)

Ely Mendez accompanied Pastor Nicolas Lopez to the jail in an effort to post bond for Mr. Mendez.  She testified that an officer told them that they could post the money, but if they posted the money, the money might be lost because the case was already in the hands of immigration. (Ely Mendez Dep. at 23-24, attached to DE 54-10.)  Ms. Mendez also stated that an officer told her that they could not post a bond because Mr. Mendez had an immigration hold on him. (Ely Mendez Aff. ¶ 4, attached to DE 1; Ely Mendez Dep. at 18-19, 24, attached to DE 70-1.)  Pastor Lopez did not hear this conversation. (Lopez Dep. at 39.)  Pastor Lopez, who tried to

6

post bond for Mr. Mendez, was told a United States citizen had to post bond. (Lopez Aff. ¶ 5, attached to DE 1.)  He returned again in July to pay the bail money, and he was told there was no bail set. (Lopez Dep. at 41.)  Because he could not post the bail, he left. (Lopez Dep. at 54.)

Mr. Mendez did not speak to his criminal defense attorney about any immigration detainer. (Mendez Dep. at 33.)  On October 9, 2009, Mr. Mendez's felony charges were dismissed by Judge Karen Miller. (Order, attached to DE 15.)  On October 16, 2009, Plaintiffs' counsel sent Defendant's counsel a letter seeking Mr. Mendez' release. (Letter, attached to DE 15.)  On October 19, 2009, Mr. Mendez's criminal attorney filed an emergency motion seeking Mr. Mendez's release, which was granted the same day at 8:56 am. (Emergency Motion and Order, attached to DE 15.)   Mr. Mendez was released on October 21, 2009 at 1:32 pm. (Defendant's Suggestion of Mootness, attached to DE 15.)

Daniel Cohen, an assistant public defender in the Fifteenth Judicial Circuit, has filed about 13 or 14  habeas petitions regarding ICE holds. (Cohen Dep. at 82-83.)  Mr. Cohen discussed the possibility of several dozen people that could be potential plaintiffs in this case.[1] (Cohen Dep. at 33.)  In addition, defendant's counsel has stipulated that 17 writs of habeas petitions were filed against the Sheriff.[2] (Ric Bradshaw Dep. at 46, attached to DE 70-1.) Captain Manley testified that it had come to his attention that people said they were not allowed to post bond. (Manley Dep. at 143.)

---

[1] Mr. Cohen also made various general assertions not based on his personal knowledge and that constituted hearsay. (Cohen Dep. at 79, 118-19.)

[2] Mr. Cohen's affidavit stated that he had filed 17 petitions "seeking extraordinary relief for people unlawfully arrested and detained by the Palm Beach County Sheriff's Office at the request of ICE. The latter petitions consist predominately of pleadings seeking writs of habeas corpus, and also include petitions seeking certiorari relief." (Cohen Aff. ¶ 3, attached to Compl.)

The relevant habeas petitions[3] are as follows: (1) Holguy Sainthlaire's petition, dated February 11, 2008, attached the affidavits of Michelle Allen and assistant public defender Carol J. Bickerstaff.  Ms. Allen states that after providing money to a bondsman, she spoke to the jail and was told bond could not be posted due to the immigration hold.  Ms. Bickerstaff stated that her clients had attempted to post bonds after arrest were unable to do so by jail personnel due to the ICE holds.  (Ex. 1, DE 92-1.)  (2) Romualdo Gonzalez-Ignacio's petition, dated February 8, 2008, attached the affidavit of an investigator Morgan Keil from the Office of the Public Defender.  He stated the supervisor of inmate records at the jail told him that Mr. Gonzalez-Ignacio was "booked for I.C.E. with no bond." (Ex. 3, DE 92-1.) (3) Melchor Andres' petition, dated November 7, 2007, included the affidavit of Marc Tracy who stated that the jail told him that Mr. Andres was "being held on misdemeanor charges and did not have a bond as he currently had an ICE detainer hold that would not permit his release at this time." (Ex. 4, DE 92-1.)  (4) Rodrigue R. Joseph's petition, filed February 20, 2009, attached an affidavit from petitioner's wife which states that she was told there was no need to pay the bond because the petitioner would be taken to Krome Detention Center and then deported to Haiti.  The next time she tried to post the bond, she was told even if she paid the bond, her husband would be taken to Miami. An investigator with the pubic defender's office, Charles J. Thompson, submitted an affidavit stating that he spoke with the Sheriff's office about bonding out an inmate, but was told he could not be bonded out because he had an ICE hold.[4] (Ex. 9, DE 93-1.)

---

[3] Plaintiffs filed a Notice to Supplement the Record (DE 92) to include these habeas petitions.  At the September 28, 2010 hearing, Defendant did not object to their consideration.

[4] These petitions also included unsworn or hearsay evidence.  Other petitions, which are unsworn, alleged incidents wholly unsupported by affidavits.  The remaining petitions do not

According to Mr. Cohen, if "the Sheriff's Office receives certain forms from ICE, the Sheriff thereby refuses to let the person leave the jail even if they have been ordered released by a state court judge on bond, on their recognizance even if their case is resolved and they got a time served plea . . . If they are otherwise free to leave the jail by bond or other means, the Sheriff will not allow them to leave because the Sheriff believes they were bound by the request of ICE and by a contractual agreement. . . ."[5] (Cohen Dep. at 120-21; see also Cohen Aff. at ¶ 2.)   Mr. Cohen remembers three different Sheriff's deputies telling him that if there is an ICE hold, he would be unable to get them out.[6]  (Cohen Dep. at 121-22.)

Upon reviewing Mr. Mendez's booking card, Captain Manley surmised that Mr. Mendez was originally booked on state charges, then on a failure to appear warrant and then on a federal

_____

support the claim that the Sheriff refused to accept bond money and therefore are not cited. Notably, the number of relevant petitions do not amount to 17.

[5] Plaintiff also submits evidence that Mr. Cohen received reports from family members and friends that the Sheriff's Office would tell them that the detainee "was not going to be released in so many words, that it was a waste of time or waste of money and either affirmatively told them not to post bond or affirmatively discouraged them from posting bond." (Cohen Dep. at 114.)  However, this evidence is hearsay and cannot be considered by the Court. Additional inadmissible hearsay presented by Plaintiff includes: (1) the assertion that El Sol is aware of different family members who were told they could not post a bond for a detainee at the Palm Beach County jail and the effect of this policy (Mary Jill Hanson Decl. ¶ ¶ 12, 15, 18); (2) Mr. Kateel's statement that a detainee's father told him that his son was reporting to him that he was being held at the Palm Beach County Jail (Kateel Decl. ¶ 9) and (3) Mr. Mendez's testimony that he encountered approximately 12 other individuals in jail who were not allowed to post bond, some of whom were held for driving without a license (Mendez Dep. at 74-75 77).  See Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1268 n.10 (11th Cir. 2010) (the plaintiff's testimony about what she heard secondhand is inadmissible hearsay which cannot be used to defeat summary judgment).

[6] The Court notes that both of these statements by Mr. Cohen appear to be true and consistent with federal law.  If proper ICE detainers are in place for a particular detainee, the detainee cannot be released despite a state judge's order or resolution of the state charges.  Thus, this evidence does not support Plaintiff's claim.  See Ricketts, 985 So.2d at 592-93.

holding charge. (Manley Dep. at 182-84.) Once a detainee is in federal custody, the Sheriff's Office cannot take any more local action. (Manley Dep. at 161.)   Captain Manley was first advised of Mr. Mendez's situation when he read about it in the local paper. (Manley Dep. at 152.) He was not aware of any jail official not accepting a bond for Mr. Mendez. (Manley Aff. ¶ 15.) Captain Manley did not receive a complaint from Mr Mendez about being improperly detained. (Manley Aff. ¶ 6.)

FLIC and Corn Maya's members include persons who have been detained pursuant to immigration detainers. (Subhash Kateel Decl. ¶¶ 6, 9; Jeronimo Camposeco Decl. ¶ 6.) FLIC tried to assist an individual whose son was held in the Palm Beach County jail on an immigration detainer, but the organization had trouble finding him because his identity was not in the booking blotter.  (Kateel Decl. ¶ 9.) Corn Maya has spent time trying to find out the whereabouts of detainees. (Camposeco Decl. ¶ 8.)  El Sol has expended resources tracking down the status of detainees. (Hanson Decl. ¶ 13.)  Captain Manley was not aware of any persons having trouble locating detainees held on an ICE detainer, but ICE attorneys advised him that detainers were not public information. (Manley Dep. at 177, 204.; see also Manley Aff. ¶¶ 4, 9)

Sheriff Bradshaw testified that he has no involvement in officer training. (Bradshaw Dep. at 65.)   During his deposition, Sheriff Bradshaw stated that he did not know what the lawsuit was about and he asked his lawyer for the "basic concept" but did not want to know all the intricacies.  He only needed to know that a lawyer was representing him.  (Bradshaw Dep. at 9.) He was unaware of the Ricketts case and when they showed him an excerpt, he stated that he did not remember being involved in it even though he was the Sheriff on that date. (Bradshaw Dep. at 10, 26-27.)   When asked if had done anything to ensure that a denial of bond did not occur, he

stated that he could not do something about something he did not know about. (Bradshaw Dep. at 28.)  At the time of the deposition, he had no intention of reading the complaint filed in the instant action. (Bradshaw Dep. at 60.)  As far as he knows, the jail is complying with the laws and he expects his legal affairs department to inform him if there are cases he needs to know about. (Bradshaw Dep. at 58.)   He does not "specifically remember" any allegations about individuals not being able to post bond in the Sheriff's Office. (Bradshaw Dep. at 25.)  Sheriff Bradshaw testified that if a person has a "right to post a bond and there is no hold on them, we go by what the law is." (Bradshaw Dep. at 32.)  Sheriff Bradshaw did not personally participate in inmate management. (Manley Aff. ¶ 2.)

## II. Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323.  To discharge this

burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

   After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  According to the plain language of  Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

   Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted."  Anderson, 477 U.S. 242, 249-50.

III.  Discussion

   Plaintiffs bring this action under 42 U.S.C. § 1983, alleging violations of the fourth and fourteenth amendments based on the following practices:

   1)   The Sheriff's wrongful confinement of pre-trial detainees with ICE detainers for lengthy periods of time without allowing them to post the bond already determined by a state court judge.

   2)   The Sheriff's wrongful confinement of pre-trial detainees for far longer than the

ICE detainer's explicit 48-hour time limit for such detentions.

Plaintiffs have sued the Sheriff in both his individual and official capacities. (Compl. ¶ 14.)

When government officials are sued in their individual capacities, "qualified immunity offers complete protection as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Oliver v. Fiorino, 586 F.3d 898, 904 (11th Cir. 2009) (quoting McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009). Qualified immunity protects officials acting within the scope of their discretionary authority at the time of the incident. McCullough, 559 F.3d at 1205. The Supreme Court has established a two-part test for determining whether government officials are entitled to qualified immunity, and the district court has discretion to determine in what order to address each part. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009). The plaintiff must prove that (1) the government official violated his or her constitutional or statutory rights and (2) those rights were clearly established at the time the official acted. Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269, 1273 (11th Cir. 2008).

Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability. Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010). "The standard by which a supervisor is held liable in [his or] her individual capacity for the actions of a subordinate is extremely rigorous." Braddy v. Florida Dep't of Labor & Employment Sec., 133 F.3d 797, 802 (11th Cir. 1998). "[S]upervisors can be held personally liable when either (1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation." Gray

13

ex rel. Alexander v. Bostic, 458 F.3d 1295, 1308 (11th Cir. 2006) citing Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999).   "Under the second method, the causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." Id. (internal quotation marks omitted).   "To be sufficient to notify the supervisor, the deprivations must not only be widespread, they also must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Id. (internal quotation marks omitted).  Or the causal connection may be shown by evidence of a "custom or policy that results in deliberate indifference to constitutional rights or facts that support an inference that the supervisors directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."  West v. Tillman, 496 F.3d 1321, 1328 (11th Cir. 2007); see Campbell v. Johnson, 586 F.3d 835, 840 (11th Cir. 2009).  The deliberate indifference standard is "a difficult burden for a plaintiff to meet." West, 496 F.3d at 1327.

With respect to an official capacity suit against the county sheriff, the suit is essentially an action against the government entity he represents; i.e., Palm Beach County.  See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, 402 F.3d 1092, 1115 (11th Cir. 2005) citing McMillian v. Monroe County, 520 U.S. 781, 785 n.2 (1997).  "A municipality can be found liable under section 1983 only where the municipality itself causes the constitutional violation at issue. Respondent superior or vicarious liability will not attach under section 1983." Id. citing City of Canton v. Harris, 489 U.S. 378, 385 (1989).   Section 1983 liability exists only when a municipality has adopted an unconstitutional custom or policy.  Id.   When liability against a municipality is based on custom, a plaintiff must establish "a widespread practice that, although

14

not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir.1991) (citations and quotations omitted). Such a widespread practice is "deemed authorized by the policymaking officials because they must have known about it but failed to stop it." Id. Moreover, "a municipality's failure to correct [ ] constitutionally offensive actions of its employees can rise to the level of a custom or policy if the municipality tacitly authorizes these actions or displays deliberate indifference towards the misconduct." Griffin v. City of Opa-Locka, 261 F.3d 1295, 1308 (11th Cir.2001) (internal quotation marks omitted). However, [r]andom acts or isolated incidents are insufficient to establish a custom." Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir.1994); see also Gilmere v. City of Altanta, Ga., 737 F.2d 894, 904 (11th Cir. 1984) ("Occasional acts of untrained policemen standing alone are not attributable to city policy or custom.") citing Bennett v. City of Slidell, 728 F.2d 762, 768 n.3 (5th Cir. 1984).

Viewing the facts in the light most favorable to Plaintiffs, the Court observes that Plaintiffs have presented evidence that Mr. Mendez was prevented from posting bond.  In addition, they have also presented evidence, by way of the additional habeas petitions and their supporting affidavits, that a handful of other individuals were denied the opportunity to post bond.[7]  Furthermore, there is deposition testimony from deputy sheriff Gwen Morales that if a detainee has an immigration hold, she would tell the person trying to post the bond that there is "a hold for immigration so there is no bond at this time."  At the same time, the record evidence

---

[7] While Plaintiffs have sought leave to supplement its opposition by filing the affidavits of Julio Cesar Gauna and Adam S. Davis (DE 87), the Court denies this motion on the basis that these affidavits fail to comply with 28 U.S.C. § 1746.

shows that the jail has a computer system in place to ensure accurate inmate management and that Captain Manley has written emails to his staff instructing them on how to handle immigration inquiries, including instructing his staff that the Sheriff's Office does not refuse bonds because of immigration holds. There is also record evidence that deputy sheriffs receive training about releases and the use of bonds.

To establish a widespread policy or custom, the evidence must show that the violations of which Plaintiffs complain extends beyond the case of Mr. Mendez, and even beyond the case of several other individuals.  Indeed, liability under section 1983 requires a high level of frequency as to the alleged constitutional violation.  See, e.g., Holloman v. Harland, 370 F.3d 1252, 1294 (11th Cir. 2004) ("Our precedents are clear that, for constitutional violations to be sufficiently "widespread" for a governmental supervisor to be held liable, they need to occur with frequency."); Denno v. School Bd. of Volusia County, Fla., 218 F.3d 1267, 1277 (11th Cir. 2000) (evidence of three other students who had been suspended for displaying confederate flags did not represent a widespread and persistent practice); Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) ("The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."); Clark v. Evans, 840 F.2d 876, 885 (11th Cir. 1988) ("[I]t is clear that four cases [alleging a prison policy of disregarding committal orders by state court judges] in four years would have been insufficient to put [the commissioner of the Department of Corrections] on notice, especially since the record is clear that such matters were handled at lower administrative levels and would not have come to the attention of [the commissioner]."); Owens v. City of Fort Lauderdale, 174 F. Supp. 2d 1282, 1295 ("it is the rare instance that only a couple

of previous incidents will be sufficient to place a municipality on notice of 'widespread abuse' constituting deliberate indifference").[8]   This "high standard of proof is intentionally onerous for plaintiffs" to avoid subjecting a municipality or supervisor to respondeat superior liability.  Gold v. City of Miami, 151 F.3d 1346, 1351 n.10 (11th Cir. 1998); see also Cottone v Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) ("The standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous.").  After careful review of the record, the Court finds that the evidence showing a mere handful of incidents does not constitute a widespread policy necessary to establish either supervisory or municipal liability.

In making this ruling, the Court also relies on West v. Tillman, 496 F.3d 1321 (11th Cir. 2007).  There, prison inmates brought a section 1983 action against the sheriff of a jail as well as the deputy warden, a correction officer and jail employees.  The prisoners claimed that their rights were violated when the jail did not properly process court orders relating to releasing them from custody.  Id. at 1327.  As part of the claim against the supervisory defendants, the plaintiffs alleged that the supervisory defendants delayed the plaintiffs' release by failing to staff, supervise and train properly.[9]  Notably, the plaintiffs did not allege that the supervisory defendants were personally involved in their over-detentions. Id. at 1328.

With respect to the evidence regarding failure to train, the West Court stated that "[e]vidence that the Jail staff occasionally erred and failed to fulfill their duties as instructed is insufficient to satisfy the high standard for supervisory liability."  Id. at 1330-31 citing Pineda v.

---

[8] The Court notes that the "situation of municipal liability" is "analogous" to the question of supervisory liability.  Holloman, 370 F.3d at 1294.

[9] The plaintiffs also complained that there was a lack of a formal release policy.

17

City of Houston, 291 F.3d 325, 333 (5th Cir. 2002) ( "[P]lainly, adequately trained officers

occasionally make mistakes; the fact that they do says little about the training program or the

legal basis for holding the city liable."). Moreover, West stated that while the record indicated

that the personnel might have benefitted from more training, the mistakes made were "in context,

isolated." Id. at 1331. West went on to say that "[e]ven assuming that the [s]upervisory

[d]efendants were aware that the lack of sufficient training of the records room staff could result

in mistakes, no evidence exists that they were aware of the need for a different kind of training or

that the training problem . . . actually led regularly to over-detention of inmates." Id.  West also

noted that the record showed that the supervisory defendants provided more on-the-job training

in response to the over-detention mistakes. Id. at 1331-32.

Next, regarding the allegations of the failure to supervise, West found that the record did

not show that "the supervisory defendants were aware of regular, as opposed to occasional,

instances of over-detention or that the [s]upervisory [d]efendants should have recognized that

those instances were a result of inadequate supervision." Id. at 1332. Furthermore, the Court

stated that even if the Sheriff was unaware of specific problems in the records department or

specific over-detentions, that "does not show that he ignored his supervisory responsibilities; he

has over 600 employees and has delegated daily responsibilities of the Jail to a warden." Id.

Here, the record evidence demonstrates that the Sheriff has delegated the responsibility

for training and supervising the jail staff to Captain Manley. Captain Manley explained the

computer system used by the jail to ensure accurate inmate management, his emails to staff about

appropriate procedure regarding bail when a detainee has an ICE hold, and the availability of

either Captain Manley or a deputy sheriff sergeant to field questions by individuals who have

18

difficult posting bond.  Significantly, the record evidence does not demonstrate anything more than the jail staff "occasionally err[ing] and fail[ing] to fulfill their duties as instructed."  Id. at 1330.

Nonetheless, Plaintiffs contend that there are genuine issues of material fact that preclude summary judgment.  To the extent that Plaintiffs rely solely on the circumstances of Mr. Mendez to defeat summary judgment, Plaintiffs are plainly wrong. See Holloman, 370 F.3d at 1294 ("for constitutional violations to be sufficiently 'widespread' for a governmental supervisor to be held liable, they need occur with frequency");  Church, 30 F.3d at 1345 (same); Gilmere, 737 F.2d at 904 (same).  Nor would one erroneous comment by deputy Morales constitute a policy of not allowing detainees to post bond.[10]   Gilmere v. City of Altanta, 737 F.2d at 904 ("Occasional acts of untrained policemen standing alone are not attributable to city policy or custom."); Brown v. Crawford, 906 F.2d at  671 ("The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.").

Nor does Sheriff Bradshaw's testimony serve to advance Plaintiffs' case.  The evidence must be examined with an eye towards whether there is a causal connection between the actions of the Sheriff and the alleged constitutional violation.  Gray ex rel. Alexander v. Bostic, 458 F.3d at 1308.  The high standard for supervisory liability means that the Sheriff's unawareness of specific problems regarding certain detainees and the acceptance of bail  "does not show that he

---

[10] Plaintiffs also complain about comments by jail staff made to individuals who have been provided "the opportunity to post bond for ICE detainees."  (DE 70 at 9.)  The Court does not see how these comments create a question of material fact regarding the alleged policy of denying individuals the ability to post bond.

ignored his supervisory responsibilities," especially where the evidence illustrates he has

delegated the daily responsibilities of the jail.   West, 496 F.3d at 1332.   For this reason, the

Court finds that Plaintiffs have not shown that the Sheriff violated their constitutional rights.

Therefore, Plaintiffs have not met their burden in showing that qualified immunity should not

apply here. See Garczynski v. Bradshaw, 573 F.3d 1158, 1166 (11th Cir. 2009) (not reaching the

question of clearly established law when no constitutional violation has been found to have

occurred); McCullough v. Antolini, 559 F.3d 1201, 1208 (11th Cir. 2009) (same).

For these reasons, the Court grants Defendant's motion for summary judgment.[11]

---

[11] Defendant also claims that McKinney v. Pate requires the Court to conclude that Plaintiffs are barred from bringing a procedural due process claim in federal court where there is an adequate state remedy.  In that case, the Court held that "only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise."  McKinney v. Pate, 20 F.3d 1550, 1557 (11th Cir. 1994).  In response, Plaintiffs cite Ricketts for the proposition that Mr. Mendez did not have a state remedy available to end his incarceration because his continued detention pursuant to a federal immigration detainer is a question of law for federal courts.  However, that portion of the Ricketts opinion concerns the ability of a detainee to challenge the validity of a federal detainer, and not the ability to post bond.  As the record demonstrates, Mr. Cohen, the defense attorney for Mr. Mendez, was familiar with the procedure for filing state habeas petitions and could have filed a petition for Mr. Mendez with respect to the Sheriff's alleged refusal to accept bond for Mr. Mendez.  Because there is no showing that the state did not provide an adequate state remedy, or that Mr. Mendez unsuccessfully availed himself of those remedies, the procedural due process claim is barred on this ground as well.

        Lastly, with respect to Defendant's argument for the application of Younger abstention, the Court will briefly note that Defendant has failed to show that the requested relief by Plaintiffs would result in "meticulous and burdensome federal oversight of state court or court-like functions." Wexler v. Lepore, 385 F.3d 1336, 1340 (11th Cir. 2004); see also O'Shea v. Littleton, 414 U.S. 488, 501 (1974) (the "'periodic reporting'" system that "might be warranted would constitute a form of monitoring of the operation of state court functions that is antipathetic to established principles of comity.").

IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1)      Defendant Ric L. Bradshaw's Motion for Summary Judgment (DE 53) is

        **GRANTED.**

2)      Defendant's Motion in Limine and/or Motion to Strike Plaintiffs' Declaration

        Exhibits (DE 86) is **DENIED AS MOOT**.

3)      Plaintiffs' Motion to Supplement its Opposition to Defendant's Motion for

        Summary Judgment (DE 87) is **DENIED.**

4)      The Court will separately issue judgment for Defendant.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 27th day of

October, 2010.

                              _____
                              KENNETH A. MARRA
                              United States District Judge